Jaco P. **SLUIJMERS**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. CIV.02–6152 AA.

United States District Court,
D. Oregon.

Sept. 11, 2003.

Michael R. Stebbins, Stebbins & Coffey, North Bend, OR, for plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General, Michael Mosman, United States Attorney, Herb Sundby, Assistant United States Attorney, Portland, OR, Philip A. Berns, Attorney in Charge, West Coast Office, Torts Branch, Civil Division, R. Michael Underhill, Lisa M. Houlihan, Trial Attorneys, Torts Branch, Civil Division, U.S. Department of Justice, San Francisco, CA, for defendant.

## OPINION AND ORDER

AIKEN, District Judge.

Defendant moves to dismiss this action pursuant to Fed.R.Civ.P. 12(1) due to lack of subject matter jurisdiction. The motion is granted.

## BACKGROUND

On February 22, 1999, plaintiff, a salvage worker, was assigned to supervise a salvage crew on the bow section of the M/V NEW CARISSA. The bow section of

the vessel was aground on the beach, in the surf line, off Coos Bay, Oregon. Plaintiff was injured when he was lowered to the deck of the M/V NEW CARISSA by a Coast Guard helicopter. The helicopter basket that he was in struck the silo hopper railing on the bow section of the M/V NEW CARISSA and plaintiff's body then struck the air vent and deck on the vessel. Plaintiff immediately experienced pain in his leg and back.

Plaintiff alleges that prior to and subsequent to his injury, all personnel who performed work on the vessel were transported exclusively by helicopter to the worksite. The crew would fly by helicopter from the North Bend Air Station to the site of the wreck by flying over Coos Bay across an area of land known as the North Spit and over the surf to the wreck site. Plaintiff alleges that he had over eighteen years of experience as a salvage worker prior to his injuries on February 22, 1999. During that period of time, plaintiff alleges that he worked on other, similar wrecks that were similarly situated to the bow of the NEW CARISSA. In his experience, it was traditional to use a helicopter to gain access to such wreck sites that were grounded on a beach or in the surf.

On May 29, 2002, plaintiff filed suit against the United States, under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (FTCA), approximately three years and three months after the date of the incident at issue. The defendant relies on the Suits in Admiralty Act (SIAA), 46 U.S.C. §§ 741, et seq., which contains a two-year statute of limitations, to argue that plaintiff's complaint must be dismissed as it was filed beyond the applicable two-year statute of limitations. Defendant moves to dismiss plaintiff's action pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction.

## DISCUSSION

The parties dispute whether this action comes within the court's admiralty and maritime jurisdiction, or is properly brought under the FTCA. A lawsuit arises under admiralty jurisdiction if: (1) the incident giving rise to plaintiff's injury occurred on navigable waters; and (2) the incident giving rise to plaintiff's complaint was a traditional maritime activity, essentially maritime in nature. *See Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990); and *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). *Grubart* further divided the second element to include an analysis of (1) whether the incident has a "potentially disruptive impact on maritime commerce;" and (2) whether the general "character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* at 534, 115 S.Ct. 1043.

The first question is whether the incident occurred "on navigable waters." Plaintiff testified in his deposition that he struck the bow section of the NEW CARISSA in two places, the helicopter basket that he was in struck the silo hopper railing on the bow section and his body then struck the air vent and deck on the vessel. Defendant's Ex. B, Plaintiff's Deposition, p. 34–36, 67–69. The defendant relies on the testimony of LCDR Cushing, a Coast Guard inspector who was on board the bow section of the NEW CARISSA on both February 22, 1999 (the date of the incident at issue), and the following day, February 23, 1999. LCDR Cushing testified that water was surrounding the bow section on both days. Courts typically hold that admiralty jurisdiction over all cases of damage or injury caused to person or property extends to all areas within the ebb and flow of the tide, regardless of whether

those areas are actually covered by water at the time of the alleged event. *See Hassinger v. Tideland Electric Membership Corp.*, 781 F.2d 1022 (4th Cir.), *cert. denied*, 478 U.S. 1004, 106 S.Ct. 3294, 92 L.Ed.2d 709 (1986) (internal quotation omitted). The best determination of the "land which is actually covered by tides most of the time" is the mean high water mark.

There is no dispute that the bow section of the NEW CARISSA was seaward of the mean high water mark on February 22, 1999. Plaintiff himself alleges that the incident at issue occurred in the "tidewaters near the north spit of Coos Bay, Oregon." Plaintiff's Complaint, ¶ 3. Further, LCDR Cushing testified that the bow section of the vessel, which was buoyant and moving slightly from day to day, was seaward of the high water mark on February 22, 1999, when he arrived on the bow section, which was shortly after the accident. Defendant's Ex. C, Cushing Deposition, p. 29–30. Finally, Cushing took video footage on February 23, 1999, the day after plaintiff's accident, which showed the bow section surrounded by water and seaward of the mean high water mark on that date. Cushing confirmed that the bow section was relatively in the same position on both February 22 and February 23, 1999. Defendant's Ex. C, Cushing Deposition, p. 12–18. Copies of still photographs made from the video footage are attached as Defendant's Exs. E, F and G.

Plaintiff asserts, however, that this issue turns on the actual navigability of the waters where the facts giving rise to the claim took place. Plaintiff argues that here, the water where the incident occurred, is not actually navigable. Plaintiff asserts that not even small crew boats, that could otherwise have been used to give workers like plaintiff access to the hull, could be used. Plaintiff's Exs. 3,6,7.

I disagree and find that the first part of the test for admiralty and maritime jurisdiction is met. The Ninth Circuit in *Complaint of Paradise Holdings, Inc.*, 795 F.2d 756 (9th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 705 (1986), held that "[t]hroughout the nation's history, tidal waters have been held to be within the definition of 'navigable waters.'" *Id.* at 759. The court there found that the water at issue, despite its shallowness, reefs, and state regulations prohibiting boating in the area, "are clearly subject to the ebb and flow of the tide, and thus navigable waters." *Id.* Similarly, here, there is no dispute that the bow section of the NEW CARISSA was within the "ebb and flow of the tide," and therefore, the incident giving rise to plaintiff's injury occurred on navigable waters.

The second part of the test for admiralty jurisdiction is whether the alleged wrong bears a "significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 251, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). *Grubart* further divided this prong to include the analysis of whether the incident has "potentially disruptive impact on maritime commerce," and whether the "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* at 533, 115 S.Ct. 1043.

Plaintiff asserts that the incident at issue here involves the helicopter transport of a repair worker to the place where he was assigned to do his work. Plaintiff asserts that the helicopter transport of a repair worker to his worksite is not peculiarly maritime, nor is it potentially disruptive to maritime commerce.

A. POTENTIAL IMPACT ON MARITIME COMMERCE

Plaintiff argues that there can be no dispute that the NEW CARISSA was a

"dead ship" at the time of plaintiff's injury. The Coast Guard established that fact twelve days before plaintiff's injury with their declaration on February 10, 1999, stating "Constructive Total Loss of (Vessel) Now Visibly Evident." The plan for the vessel, which by this time had broken in two, was to refloat the bow section, tow it out to deep water, and sink it. Plaintiff's Ex. 4. The M/V NEW CARISSA was permanently out of navigation for commercial purposes and its bow section was to be made "navigable" only for the non-commercial purpose of her final disposal at sea. Contracts relating to the preparation of a dead ship for use, and torts arising during such work, are not subject to maritime law. *Robert E. Blake, Inc. v. Excel Environmental*, 104 F.3d 1158, 1160–62 (9th Cir.1997). Plaintiff argues that, moreover, none of the incidents alleged in his complaint leading up to his injury involved the conduct of salvage work. The conduct involved was the transport of workers to and from a worksite by helicopter. Plaintiff argues that the general conduct was transportation. The incident that caused the injury was the allegedly negligent transportation of a worker to a dead ship site. Plaintiff asserts that there is nothing about these facts that could potentially disrupt maritime commerce.

■ Admiralty jurisdiction exists only if the wrong has a potential to disrupt maritime commerce. The question here is whether injury to a salvage worker working on a grounded vessel on navigable waterways causes a potential impact on commerce. *See Grubart*, 513 U.S. at 538, 115 S.Ct. 1043 (incident must be described "at an intermediate level of possible generality").

The incident involving plaintiff occurred during his and his employer's work in performing the task of salvaging the vessel and preventing further oil spills. Plaintiff states, "[p]art of the work the plaintiff was doing had the goal of pumping fuel and seawater out of the bow section of the NEW CARISSA so that it would float off the bottom and could be towed out to the high seas and sunk." Plaintiff's Sur-reply, p. 8. Defendant asserts that because the bow section of the NEW CARISSA was moving every day it existed as a potential hazard both as a continuing pollution threat and as an obstruction to navigation.

The Ninth Circuit has held that, "[t]he commercial impact prong considers whether the general features of the incident could hypothetically have an effect on maritime commence. It does not require that any impact actually occurred." *Christensen v. Georgia–Pacific Corp.*, 279 F.3d 807, 815, n. 31 (9th Cir.2002). The work plaintiff was performing, and then interrupted from due to his injury, was related to maritime commerce—specifically, the further prevention of an oil spill.

Moreover, plaintiff's injury caused a direct effect on the work described in the "Unified Command Memos" since it prevented plaintiff, an assistant supervisor, from continuing to perform his own work, which included supervising other crew in attempting to move the bow and sink it before it could leak more oil into the ocean; and it caused other crew, specifically plaintiff's supervisor, from also fully performing his work. Defendant's Ex. D, plaintiff's deposition, p. 38–43.

Therefore, I find that this incident had a potential impact to maritime commerce.

### B. SUBSTANTIAL RELATIONSHIP TO TRADITIONAL MARITIME ACTIVITIES

■ The second prong of the test requires defendant to demonstrate that the general character of the activity giving rise to the claim bears a substantial relationship to traditional maritime activities. *Sisson*, 497 U.S. at 364, 110 S.Ct. 2892. Plaintiff argues that the general conduct

from which the incident arose is the transportation of workers to a dead ship site by helicopter. Plaintiff asserts that the helicopter was not performing a function which ordinarily or formerly could have been carried out by ships. Plaintiff asserts that he could not have gained access to the bow section by boat. Plaintiff's Exs. 3, 6, 7.

█ I disagree. In determining whether there is a relationship between the activity giving rise to the incident and traditional maritime activity, courts look at the relevant activity, not as defined by the particular circumstances of the incident, but by the general conduct from which the incident arose. *See Sisson,* 497 U.S. at 363, 110 S.Ct. 2892. Salvage work, which is traditionally maritime in nature, is the general conduct from which the incident arose. *See Harrington v. United States,* 748 F.Supp. 919, 928 (D.P.R.1990) (salvage is tradition maritime activity). Plaintiff was a salvage worker, who in the performance of a traditional maritime activity, was boarding a vessel and was injured on that vessel, specifically, on the bow section of the NEW CARISSA.

Plaintiff attempts to distinguish his case by arguing that because a helicopter was involved in his transport and ultimately, his injury, that his facts fall outside the realm of admiralty jurisdiction. Plaintiff further argues that his case does not involve a helicopter performing a function traditionally performed by ships. Again, I disagree. The Coast Guard helicopter was being used to transport salvage personnel to perform salvage work on the bow section of the M/V NEW CARISSA. This is the type of activity that courts have found to be a "traditional maritime activity." *See Icelandic Coast Guard v. United Technologies Corp.,* 722 F.Supp. 942 (D.Conn. 1989) (flight of Coast Guard helicopter used for marine rescue and patrol operations had significant relationship to tradi-

tional maritime activities even though helicopter was based on land and engaged in routine flight training at time of crash); *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 218, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (helicopter ferrying passengers from offshore drilling platform to shore was "engaged in function traditionally performed by waterborne vessels," so admiralty jurisdiction was properly invoked); *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 620, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978) (offshore drilling platform workers killed when helicopter carrying them from platform to shore crashed approximately thirty miles off Louisiana coast was admiralty).

The Ninth Circuit in *T.J. Falgout Boats, Inc. v. United States,* 508 F.2d 855 (9th Cir.1974), *cert. denied,* 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975), did not examine the specific activity performed by the Navy jet but instead found that the Navy jet was "by its very nature maritime." *Id.* at 857. The court focused on the fact that the United States Navy exists, in major part, for the purpose of operating vessels and aircraft in, on, and over navigable waters. Here, the Coast Guard, similar to the Navy, is a sea based service operating its aircraft essentially to serve in sea operations. The Coast Guard was using helicopters, in lieu of vessels, to transport salvage personnel and other workers to the bow section of the M/V NEW CARISSA to assist in the removal of the vessel.

Therefore, I find that the general character of the activity giving rise to plaintiff's claim bears a substantial relationship to traditional maritime activities.

### CONCLUSION

I find that admiralty law controls this action. The incident occurred on navigable waters and the incident has a "mari-

time flavor." *See Christensen,* 279 F.3d at 815. The incident has a maritime flavor because first, it had a potential impact on maritime commerce. That potential impact occurred when plaintiff's injury removed him as an assistant supervisor of the salvage crew attempting to move the bow of the vessel and sink it before it leaked more oil potentially causing additional devastating impact on the coastal environment. Second, the incident was related to a traditional maritime activity because the injury occurred when a salvage worker was attempting to work on the deck of a vessel to perform salvage operations.

In conclusion, I find that this incident had a sufficient maritime nexus to be considered a maritime tort. Therefore, defendant's motion to dismiss (doc. 10) is granted. This case is dismissed. All pending motions are denied as moot.

IT IS SO ORDERED.